IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff : <br> : <br> v. : <br> : <br> JOHN M. SENSENIG, : <br> : <br> Defendant : <br> : | Civil Action No. |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1. From at least 1997 until 2009, John M. Sensenig ("Sensenig"), a member of the Mennonite community located near Lancaster, Pennsylvania raised millions of dollars from more than 1,500 members of the Amish and Mennonite communities located throughout the United States through the offer and sale of Promissory Notes. Sensenig used the proceeds to finance a collection of start-up companies he founded and controlled, the largest of which was Conestoga Log Cabin Leasing, Inc.

2. Sensenig failed to register the offering of the Promissory Notes and, in connection with the offering, made material misrepresentations and omissions, including failing to disclose to investors significant information concerning, among other things, the use of proceeds, the risks associated with the investment, and remedial sanctions placed on him by a state securities regulator.

3.  As a result of the conduct described in this Complaint, Sensenig has violated, and unless restrained and enjoined, will continue to violate, Sections 5(a), 5(c), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(2) and 77q(a)(3)], thereunder.

## JURISDICTION AND VENUE

4.  The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], to enjoin such acts, transactions, practices, and courses of business; and for other appropriate relief.

5.  This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

6.  Venue is proper because certain of the acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Pennsylvania. In addition, the defendant worked and resided in the Eastern District of Pennsylvania.

7.  In connection with the conduct alleged in this Complaint, the defendant directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, or of the mails.

## DEFENDANT AND RELEVANT ENTITIES

8.  **John M. Sensenig**, age 61, is a resident of New Holland, Pennsylvania and was the founder, Chief Financial Officer and partial or full owner of CLCL and each of the Affiliated Companies. Sensenig has never been registered with the Commission in any capacity. He completed his formal education after the eighth grade and is currently working part-time as a plastic welder.

9.  **Conestoga Log Cabin Leasing, Inc. ("CLCL")**, was established by Sensenig as a Pennsylvania corporation in 1997. CLCL, through a subsidiary, built log cabins that it leased to campgrounds and parks. CLCL's primary function, however, was to channel millions of dollars of investor funds, in the form of loans, to over a dozen of Sensenig's start-up companies.

10. **The Affiliated Companies** include numerous companies founded by Sensenig from approximately 1988 through 2007. These companies include Ark Enterprises, Brohnwood, Inc., Conestoga Log Cabin, Inc., Flintwood Metals, Glue-Lam, Lebanon Finished Products, Inc., Metal Roofing & Siding, Inc. (a/k/a Everlast Roofing, Inc.), Pioneer Pole Buildings, Inc., PostSaver USA, LLC, Restoration Connection, Twin Grove Campground, Washington Street Castings, Inc., Conestoga Wood Machinery, and Conestoga Projects, Inc. The majority of these companies are no longer operational. Of these companies, only Everlast Roofing, Inc. and Pioneer Pole Buildings, Inc. fully repaid the amounts owed to CLCL.

## FACTS

11. Beginning in approximately January 1997, Sensenig began raising funds from fellow Mennonites and Amish through the wide-spread sale of Promissory Notes. From 1997 through March 2009, he raised more than $90 million, approximately half of which was subsequently repaid.

12. Sensenig drafted the Promissory Notes offered and sold to investors, and was the sole contact person for investors. Sensenig made virtually no disclosures to investors about what he would do with the money once it was raised.

13. Until the summer of 2005, Sensenig solicited investors by placing classified advertisements in two newspapers that were widely read by members of the Amish and Mennonite communities. The advertisements, which ran weekly from at least as early as 2001

3

until late 2005 provided Sensenig's address and phone number and simply stated "WE PAY 6% on demand notes, 7% on 6-month notes, 8% on 3-year notes, 9% on 5-year notes."

14.     Although the advertisements stopped running in approximately August 2005, many people who invested after that time learned about the opportunity to invest with Sensenig because they had seen the advertisements. Many others invested after learning about the investment from friends, family members and neighbors who had previously invested.

15.     To invest, potential investors sent Sensenig money and selected the duration of the Promissory Note. Approximately 200 investors never met or spoke with Sensenig before investing. The only documents investors received at the time of their investments were an Application Form and a Promissory Note. The Application Form listed the note options (on demand, 6-month, 3-year, or 5-year) and requested investors' addresses and social security numbers. The Application Form stated in part:

> For your information: This service was set up many years ago because our older church members who largely do not collect social security (for Amish/Mennonite religious reasons) wanted to earn more interest to help pay for their groceries and doctor bills. Our people requested that we set this service up and to not 'play with stocks'. We ask that only our own people (Amish/Mennonite type of persons) invest here. This arrangement is not for the general public. Thank you. You may hand out this form if you wish.

16.     The Application Form did not request any information about the investors' wealth or investment experience. Sensenig did not exclude anyone from investing based on their age, education, income, assets, or investing experience. Investors ranged in age from teenagers to the elderly. Most of the investors likely would not have met the definition of an accredited investor as they were predominantly farmers and craftsmen, and were not experienced investors.

4

**The Pennsylvania Cease and Desist Proceeding**

17.  By the middle of 2005, over 1,300 people had invested approximately $83 million with Sensenig and CLCL.  On June 8, 2005, the Pennsylvania Securities Commission ("PSC"), now part of the Pennsylvania Department of Banking and Securities, issued a summary cease and desist order compelling Sensenig, CLCL and all affiliates to halt the offer and sale of unregistered securities in Pennsylvania.  The state securities action was based on Sensenig's failure to comply with the securities registration requirements of Section 201 of the Pennsylvania Securities Act of 1972.  In January 2006, Sensenig and the PSC reached a settlement pursuant to which Sensenig and CLCL were permanently barred from offering or selling unregistered securities in Pennsylvania.

18.  From June 2005 through March 2009, Sensenig continued to raise money from investors located in Pennsylvania and throughout the United States, though in smaller amounts.  During this time, Sensenig directed most of the investor funds directly to the Affiliated Companies, rather than channeling them through CLCL.

19.  Following the PSC action, Sensenig sent periodic updates to investors informing them that as a result of the state securities action, he was unable to continue raising funds as he had in the past and could not continue making redemptions.  He asked investors to be patient and "delay withdrawing your money until we are registered.  Then everything should be back to the normal routine you were used to."

**Sensenig Violated the PSC Order and Federal Registration Requirements.**

20.  Sensenig failed to register any offerings with the Commission and, in violation of the PSC order, continued to raise funds for CLCL and the Affiliated Companies.

21. The Promissory Notes were offered and sold to more than 1,500 investors in at least 27 states. Many of the individuals who purchased the Promissory Notes were unsophisticated and inexperienced investors. Sensenig sold Promissory Notes to investors without regard to their age, investment experience or financial situation.

22. The offer and sale of the Promissory Notes was not exempt from registration with the Commission. Despite the lack of any available registration exemption, Sensenig never filed a registration statement with the Commission relating to the offering.

**Sensenig Misled Investors.**

23. Sensenig misled investors by failing to disclose to them facts which may have affected their decision to invest in his companies. Sensenig provided potential and existing investors with little to no written information about CLCL and the Affiliated Companies. The Application Form and advertisements in the newspapers were the only written materials made available to investors prior to their investments.

24. Sensenig never provided investors with any Private Placement Memoranda, Offering Memoranda, or financial statements. Sensenig did, however, issue Promissory Notes and quarterly statements to investors after their funds were deposited into one of the accounts he controlled. In addition to reporting the amounts owed, Sensenig often included status updates regarding the progress of CLCL and the Affiliated Companies. Investors received identical status updates on their statements, regardless of which company they invested in. The information contained in these statements was generally positive and forward looking, and remained so even as the financial condition of many of the Affiliated Companies worsened.

25. Sensenig did not disclose to prospective and existing investors how the proceeds would be used or the risks of investing in CLCL and the Affiliated Companies. Although

investing in start-up companies is inherently risky, Sensenig led investors to believe that the Promissory Notes were low risk and implied they could be used as a substitute for social security.

26. As set forth in Paragraph 15 above, Sensenig represented in the Application Form that the investment platform was "set up many years ago because our older church members who largely do not collect social security (for Amish/Mennonite religious reasons) wanted to earn more interest to help pay for their groceries and doctor bills." Sensenig repeated this representation in other periodic notes sent to investors.

27. By implying that investments in CLCL and the Affiliated Companies were appropriate substitutes for social security, Sensenig misled investors to believe that these investments were low risk when, in fact, they were highly speculative.

28. In addition, Sensenig did not adequately describe to investors the financial condition of CLCL and the Affiliated Companies, nor did he disclose that it was unlikely investors would be able to redeem their investments in light of the companies' accumulating debts. Rather, Sensenig led investors to believe that the companies were doing well when, in fact, the majority of the companies were losing money and were highly indebted to CLCL. In fact, from 2005 until 2009, many of the companies reported increasing losses and negative net worth in their corporate tax returns.

29. In addition, Sensenig did not disclose the existence of the PSC Order to some investors and misled others about the scope of its ruling. Although Sensenig disclosed the PSC Order to investors who invested prior to the issuance of the order, he did not inform all new investors who invested after the fall of 2005 about the PSC Order. In other instances, Sensenig

disclosed the existence of the PSC Order, but claimed it did not prohibit him from raising funds for other companies.

30. Finally, Sensenig did not disclose to all investors the existence and role of the Affiliated Companies. Specifically, Sensenig did not disclose that investor funds would be directed into approximately a dozen different startup companies that he managed and partially owned. Instead, Sensenig led some investors to believe that he was actively running only one, or possibly two to three, companies.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act

31. The Commission realleges and incorporates by reference each and every allegation in Paragraphs 1 through 30, inclusive, as if the same were fully set forth herein.

32. By engaging in the conduct described above, defendant Sensenig, directly or indirectly, by use of the means and instruments of transportation or communication in interstate commerce and by use of the mails has:

    a. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    b. engaged in transactions, practices, or courses of business which operated, or would operate as a fraud or deceit upon the purchasers of securities.

33. By reason of the foregoing, defendant Sensenig directly and indirectly, has violated, and unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## SECOND CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

34. The Commission realleges and incorporates by reference each and every allegation in Paragraphs 1 through 33, inclusive, as if the same were fully set forth herein.

35. From at least 1997 until 2009, defendant Sensenig, by engaging in the conduct described above, directly or indirectly, in connection with a security for which no registration statement was in effect, and in the absence of any applicable exemption from registration:

   a. Made use of a means or instrument of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

   b. Carried or caused to be carried through the mails or in interstate commerce, by any means or instrument of transportation, such security for the purpose of sale and/or for delivery after sale; and or

   c. Made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy such security through the use or medium of a prospectus or otherwise.

36. By reason of the foregoing, defendant Sensenig violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

I.

Permanently enjoining Defendant from violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q].

II.

Imposing civil monetary penalties upon Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

III.

Permanently enjoining Defendant from any direct or indirect participation in any unregistered securities offering.

IV.

Ordering Defendant to surrender all shares of stock he owns in Pioneer Pole Buildings, Inc. and Everlast Roofing, Inc. to the respective companies for cancellation.

V.

Order such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

_____
Daniel M. Hawke
Elaine C. Greenberg, PA Bar No. 48040
G. Jeffrey Boujoukos, PA Bar No. 67215
Kingdon Kase, PA Bar No. 37952
Jennifer F. Miller, PA Bar No. 82826

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100

Dated: July 29, 2013